# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**MICHAEL D. MARTIN,**                               *

    **Plaintiff**                                        *

**v.**                                               *          **Civ. No. DLB-22-922**

**WARDEN RONALD S. WEBER,** *et al.*                 *

    **Defendants**                                     *

## MEMORANDUM OPINION

Michael D. Martin was violently assaulted by another inmate on March 13, 2022 while Martin was housed at Western Correctional Institution ("WCI"). In this civil rights action under 42 U.S.C. § 1983, Martin alleges that WCI Warden Ronald S. Weber and WCI staff Joseph Jefcoat, James Smith, Jason Harbaugh, and Steven Beeman failed to protect him from the assault. ECF 5. Martin also claims WCI staff John Sindy, Michael Yates, and Curran McKenzie interfered with his access to the courts by denying his requests for his prison base file. ECF 20. Pending is the defendants' second motion to dismiss or for summary judgment. ECF 40. In support of their motion, the defendants filed prison records, ECF 40-3, at 3–5; ECF 40-4, at 3; ECF 40-5 – 40-8, and declarations, ECF 40-3, at 1–2 (Yates decl.); ECF 40-4, at 1–2 (Jefcoat decl.). Martin filed an opposition supported by prison records and medical records. ECF 46, 46-1 – 46-16. The defendants filed a reply. ECF 52.

On September 8, 2023, a year after Martin filed his complaint, he filed a motion for an injunction, seeking placement in administrative segregation at North Branch Correctional Institution ("NBCI"), the facility where he is currently housed, or transfer to a prison with protective custody. ECF 53. The Court ordered a response to the motion for injunction and supplemental briefing on the summary judgment motion. ECF 54. Martin filed an affidavit in

support of his opposition to the summary judgment motion. ECF 55. The defendants filed a supplemental reply and opposition to Martin's request for an injunction, ECF 62, as well as additional declarations, ECF 62-2 (Yates decl.); ECF 62-3 (Harbaugh decl.); ECF 62-5 (Clise decl.); ECF 62-6 (Beeman decl.). Martin also filed two requests for appointment of counsel. ECF 59, 64. For the reasons that follow, the defendants' motion, treated as a motion for summary judgment, is granted as to the failure-to-protect claim against Warden Weber, Jefcoat, Smith, and Beeman; denied as to the failure-to-protect claim against Harbaugh; and granted as to the access-to-courts claim. Martin's motions for appointment of counsel are granted. His motion for an injunction is denied.

## I.    Background

These facts are undisputed unless otherwise noted. Martin was convicted of first-degree murder in 2013. ECF 40-8, at 1. In 2014, Martin testified in open court that the shooter was his co-defendant, not him. Since his conviction, Martin has been in Maryland state custody. From 2014 to late 2020, Martin was housed at NBCI. There, he filed written requests to be placed in protective custody or transferred to a different institution because other inmates knew he was bisexual and considered him a "snitch," they wanted to hurt him, and he feared for his safety. He made these written requests to NBCI officials on June 4, 2014; January 11, May 2, August 13 and 27, 2017; and October 17, 2018. ECF 46-1, at 2; ECF 46-2, at 2; ECF 46-3, at 2; ECF 46-6, at 3; ECF 46-7, at 3; ECF 46-8, at 1.

On June 4, 2014, Martin said he had "enemies in the facility and on 3-C and 3-D" and that he was "recieving [sic] threats that [he was] going to Die soon." ECF 46-1, at 2. On January 11, 2017, he said that he had "enemies in Building 2 (that [he could] identify by name) and the Bloods and BGF [we]re both trying to kill [him]" and he was "afraid to return to Building 2." ECF 46-2, at 2.

In May and August 2017, Martin wrote to the NBCI warden three times. First, he wrote:

> Over the past 3 years I have been extorted and threatened for being a snitch. I am on disciplinary segregation for refusing housing because I am scared for my life. The Bloods and BGF gang have ordered me to pay them, but [because I am] unable to pay they have been issuing threats to kill me. I am requesting to be placed on protective custody.

ECF 46-3, at 2. Then he wrote: "I am requesting to list and document the Bloods and BGF gang as my enemies. Both gangs are trying to bring me harm." ECF 46-6, at 3. Finally, he wrote: "This letter is in regard to my letter dated 8-13-17 concerning my safety. I am respectfully requesting to be housed on protective custody." ECF 46-7, at 3.

On October 17, 2018, Martin filed a request to transfer to another prison, stating: "In [NBCI] I am known by too many inmates as a 'snitch' because my co-defendant is in WCI. In another institution I can conceal my name and stay to myself and not be known to other inmates. I have been consistently extorted and threatened by BGF and Bloods." ECF 46-8, at 1.[1]

On December 21, 2020, Martin was transferred to WCI. ECF 40-6, at 2; ECF 55, ¶ 1. Four months later, on March 27, 2021, Martin was involved in an altercation with other inmates and placed on disciplinary segregation. ECF 40-4, ¶ 3; ECF 55, ¶ 1. After the altercation, Martin told his case manager, Joseph Jefcoat, that he "was unsafe in general population." ECF 55, ¶ 2. Martin also advised Jefcoat that his co-defendant—against whom Martin had testified—also was incarcerated at WCI. ECF 40-4, ¶ 4. Martin stated that his co-defendant had been sharing transcripts of Martin's trial testimony and talking about Martin's testimony with other inmates since Martin arrived at WCI, and as a result, Martin had been labeled a snitch. *Id.*; ECF 40-5

---

[1] The Court takes judicial notice of the fact that NBCI and WCI are situated adjacent to each other in the same state prison compound.

(inmate statement). Jefcoat directed Martin to provide a written statement. ECF 40-4, ¶ 6; ECF 55, ¶ 2. Martin did as directed.

On April 30, 2021, while he was on disciplinary segregation, Martin wrote the following statement to case management on an "Inmate Statement" form:

> On April 16th 2014, at my sentencing hearing I made a statement against my co-defendant Mikal Martin. The statement I made was testifying that he was the shooter and not me. My co-defendant has a letter I wrote to my trial judge and my trial transcripts that he are and [sic] has been showing to inmates on the compound. Inmates has been talking about my statement since I've been in WCI. I am afraid of getting hurt or killed because I am now being labeled a snitch and a Rat. I just want to try to stay safe and out of trouble. The organization I am afraid of is the Bloods. I am part of the bloods, but because of my statement Im [sic] no longer a blood and may be attacked for being a snitch.

ECF 40-5. Jefcoat signed the statement as a witness. *Id.*[2] Martin insists that, after he spoke to Jefcoat and provided his inmate statement, no investigation was initiated, and he was not transferred to protective custody. ECF 55, ¶ 4. Martin's family called the institution several times to request transfer to protective custody. *Id.* Martin eventually was moved to administrative segregation and placed on WCI's transfer list. *Id.*; *see* ECF 40-1, at 3.[3]

Here is Jefcoat's recollection of the events:

> Plaintiff was on my case load [sic] when he was on Disciplinary Segregation in April 2021. At that time, he notified me that his co-defendant was also at the institution, and that he had made a statement against his co-defendant at his sentencing hearing and that he is now being labeled a "snitch."

> From a review of his co-defendant's traffic history, I can confirm that the co-defendant was housed at WCI from March 26, 2014 through November 2021.

---

[2] In his complaint, Martin alleges that around April 25, 2021, he alerted Coates, Smith, Harbaugh, Beeman, and Weber that he felt his "life was in danger." ECF 5, at 2. However, Martin does not provide any evidence that he spoke with anyone besides Jefcoat. ECF 55, ¶ 2.

[3] The parties agree that Martin was transferred to administrative segregation on August 23, 2021, ECF 55, ¶ 4; ECF 40-1, at 3, even though documents in the record suggest he was transferred on May 24, 2021. ECF 40-7, at 1 (case mgmt. email); ECF 40-8, at 1 (case mgmt. assignment sheet). Precisely when Martin was transferred is not material to the issues raised in the motion for summary judgment.

During this time, he did not have a violent infraction history, and there were no documented conflicts or issues between Plaintiff and the co-defendant. I do not know why Plaintiff first voiced a concern about the co-defendant in April 2021.

When Plaintiff came to me, I instructed Plaintiff to write a statement, so on April 30, 2021 he wrote a statement explaining his fears and concerns. Following this statement, his co-defendant was verified and placed on his enemy list. In addition, Plaintiff remained on restrictive housing until January 27, 2022. I was no longer his case manager at the time he was released from restrictive housing, and had no role in that decision.

Though Plaintiff was at one point placed on a transfer list due to the situation involving his verified enemies, he was removed from the transfer list once the situation involving two documented enemies had resolved. I was not involved in the decision to remove him from the transfer list.

Specifically, Plaintiff confirmed and signed-off that one individual was no longer his enemy. The second enemy – his former co-defendant – was then transferred to another institution on November 6, 2021. As a result, there was no longer a documented danger to him, and he was removed from the transfer list.

ECF 40-4, ¶¶ 4–8.

Jason Harbaugh, Chief of Security at WCI, asserts there was an investigation into Martin's

"Inmate Statement in which he claimed to have been labeled a snitch[] and [said] that he believed

he was in danger from the Bloods as a result." ECF 62-3, ¶¶ 7, 10.[4] Harbaugh received and

---

[4] Harbaugh never explicitly states that he is referring to Martin's April 30, 2021 inmate statement. But the April 30, 2021 statement is the only inmate statement in the record and at issue in this case. To make matters more confusing, the defendants also submitted a November 18, 2022 "Inmate *Request*" form that Martin filled out and directed to Security Chief Harbaugh. ECF 62-4, at 4 (emphasis added). There, Martin wrote:

On 4-30-21, I made a statement informing personel [sic] that I am branded a snitch. On 3-13-22 I was stabbed by Antonio White who is a Blood. I have been housed on administrative segregation. However, I am asking to be removed from administrative seg. and housed on protective custody. Because the Bloods are a threat to my life, I cannot go to any other prison and be safe. . . .

*Id.* Upon receipt of the inmate request form, Harbaugh assigned the matter for investigation on November 21, 2022 and received the following report on December 9, 2022: "Δ is currently on Ad Seg. Δ is on Max transfer List. Δ always complaining. Not a candidate for PC." *Id.* at 2–3. It is not clear why the defendants submitted these documents, which postdate the assault, or why they refer to them in their supplemental briefing, ECF 62, at 3. They are not relevant to Martin's

reviewed Martin's statement and thought it was insufficient to necessitate an investigation. ECF 62-3, ¶ 10. Even so, Harbaugh assigned an investigator to look into his claims. *Id.* ¶¶ 7, 10. He states that Martin's "security concerns . . . were assigned to the Intelligence Division to investigate." *Id.* ¶ 7. Harbaugh states: "To my knowledge, Plaintiff Michael Martin never provided any additional information to investigators regarding the threat itself, any involved individuals, dates, times, or locations to assist in the investigation. I am further aware that at the conclusion of the investigation, it was determined that Plaintiff's allegations were unsubstantiated." *Id.* ¶ 10. Harbaugh notes that many inmates at WCI "have been labeled a snitch during their incarceration, but went on to live in the General Population without incident." *Id.* ¶ 11. With respect to Martin, Harbaugh takes the position that being labeled a snitch did not "necessarily mean that he could not safely return to the General Population." *Id.*

On January 13, 2022, Correctional Case Management Specialist Rodney Davis emailed John Sindy, Steven Beeman, and "Joseph" (perhaps Jefcoat) and asked: "Inmate was placed on AS in May 2021 due to an enemy situation. He has signed off on one enemy and the other was transferred to PATX..........Can he be removed?" ECF 40-7, at 1. Seven minutes later, Sindy replied "ok with me- No metal involved." *Id.* And within the hour, Beeman replied, "I don't see why not." *Id.* at 2. Beeman insists "[t]he information contained in this email was the only information that [he] had been provided regarding this matter . . . ." ECF 62-6, ¶¶ 5, 6. Beeman "was never advised that [Martin] had been labeled a snitch, that he had received threats, or that he feared for his safety," and he "was never assigned to investigate any alleged threats to his safety." *Id.* ¶ 6. Beeman did "not recall ever attending a meeting where Plaintiff Michael Martin was discussed" and did "not

---

failure-to-protect claim, which is based on the failure to investigate and address the safety concerns Martin raised in his April 30, 2021 inmate statement.

believe that [he had] ever personally interacted, or held a conversation with Plaintiff Michael Martin." *Id.* ¶ 2. Nor did he receive any written communications from Martin. *Id.* ¶ 5. Further, while

> it is common for an [inmate] within the facility – who is not otherwise involved in the situation – to communicate that threat to [Beeman], and request that the target of the threat be moved from a tier or building for his own safety[,] . . . no [inmate] ever communicated to [Beeman] that there was a threat to Plaintiff's safety at the facility, or provided information to [Beeman] that suggests that Plaintiff has been labeled a snitch.

ECF 62-6, ¶ 7. According to Beeman, "[w]hen this happens, the facility works quickly to remove that [inmate] from a dangerous situation." *Id.*

Based on the belief that Martin had "no known enemies at the institution," the decision was made on January 27, 2022 to remove Martin from administrative segregation and the transfer list and to return him to general population. ECF 40-4, ¶¶ 8–10; ECF 55, ¶ 5. According to Jefcoat, he "was no longer [Martin's] case manager at the time he was released from restrictive housing, and had no role in that decision." ECF 40-4, ¶ 6. On February 3, 2022, Martin was transferred back to general population. ECF 40-6, at 1. He asserts that the tier on which he was placed had 12 Bloods members on it. ECF 55, ¶ 6.[5]

On March 13, 2022, six weeks after his transfer to general population, Martin was stabbed in the face by another inmate. ECF 46-12, 46-13. Martin states his attacker was "a high ranking member of the Rollin 20's Bloods gang." ECF 55, ¶ 6. Martin concedes he "never claimed to have

---

[5] In his complaint, Martin claims that, after his return to general population, he informed Harbaugh, Beeman, and the Warden that he felt that his life was in danger and he asked to be housed in a different tier but his request was denied and "[n]o investigation was done in regards to this matter." ECF 5, at 3. But Martin's complaint is not evidence. In his affidavit—the only evidence Martin submitted about his communications with WCI staff other than his April 30, 2021 inmate statement—Martin does not swear that he told Harbaugh, Beeman, and the Warden about his fears after he was transferred to general population. *See* ECF 55.

any safety concerns specific to [his assailant] because [Martin] had no way of knowing that the Bloods would specifically send [that individual] to stab him." ECF 46, at 14; ECF 55, ¶ 7.

Other than his April 30, 2021 inmate statement, there is no documentation in Martin's case file that "confirms that he complained to prison staff about specific fears for his safety" before the March 2022 assault. ECF 40-3, ¶ 7; *see* ECF 40-4, ¶ 11. Yates states that "[i]f Plaintiff had made staff in his housing unit aware of a specific threat to his safety, there would have been documentation confirming that communication," and "if he had advised prison staff of a perceived threat during a segregation meeting, that also would have been documented in his file." ECF 40-3, ¶ 8; *see* ECF 40-4, ¶ 11. Jefcoat, too, says that "there were no such safety concerns documented in his file." ECF 40-4, ¶ 11.

Several defendants have submitted declarations explaining how the prison responds when an inmate informs correctional staff about a threat against him. Harbaugh says that first the inmate is placed on administrative segregation or in protective custody pending investigation. ECF 62-3, ¶¶ 3–4; ECF 62-5, ¶ 3. The inmates meet weekly with a Segregation Review Team for the first 60 days and every 30 days after that. ECF 62-5, ¶ 4. Often, an inmate is assigned to administrative segregation or protective custody if he has so many enemies "throughout the Division of Correction's ("DOC") Institutions that he or she cannot be safely housed," or if there were "recent assaults on [the inmate] in which staff cannot identify and confirm all [inmates] who were involved as attackers in order to eliminate the threat to an individual." *Id.* ¶ 3. A "final option would be to transfer an [inmate] to another State." *Id*.

To aid the prison's investigation, it is the inmate's "responsibility to provide as much detailed information as possible," including "names, dates, places, and times regarding the threats or dangers." ECF 62-3, ¶¶ 3–4. If the inmate does not "provide specific information regarding

threats, individuals, dangers, or other information, then the institution is left to conduct an investigation on its own without assistance" from the inmate. *Id*. ¶ 5. According to Harbaugh, "there is ongoing communication between the [inmate] and correctional staff," and the inmate "is given as much time as needed to provide quality information to aid in the investigation." *Id.* ¶ 4.

According to Beeman, who is in the Intelligence Division, "when an [inmate] wishes to communicate with the Intelligence Division, he can complete and mail an 'Inmate Request Form'" to provide information or request a meeting, which can "trigger a follow up conversation or interview." ECF 62-6, ¶¶ 3–4. The Intelligence Division reviews any information it receives from the inmate, reaches out to the inmate if the inmate requests a meeting, and reaches out to confidential sources and other individuals in the institution who are asked general and specific questions. *Id*.; ECF 62-3, ¶ 8. The investigations are performed carefully so as not to reveal the reason behind the questions asked. ECF 62-3, ¶ 8; ECF 62-6, ¶ 9. "[I]nvestigators take into account the totality of the circumstances, reviewing all correspondence, speaking with willing individuals, and monitoring activity on the tiers and within the institution." ECF 62-6, ¶ 9. The purpose of the investigation is to gather all relevant information to determine whether any perceived threat can be verified. ECF 62-3, ¶ 8. The prison continues to communicate with the inmate during the investigation. *Id*. ¶ 4. Beyond these targeted investigations, "correctional staff and members of the Intelligence Division continually monitor the institution, information obtained from [inmates], and correspondence to determine any ongoing threats to [inmates], whether or not it had previously been reported." ECF 62-6, ¶ 10. Ultimately, if an alleged threat cannot be substantiated, the inmate is returned to general population because "[Department of Public Safety and Correctional Services ("DPSCS")] cannot justify holding an [inmate] on administrative segregation for a prolonged period without cause." ECF 62-3, ¶ 6.

Jason D. Clise, a Correctional Case Management Specialist at WCI, states that "DOC policy towards Enemy Alerts pertains to individuals, not entire groups." ECF 62-5, ¶ 6; *see* ECF 62-3, ¶ 9.

> It is not feasible to keep an individual away from an entire group because doing so would not confirm any threat was resolved; the Institution may not know all members of that specific group. Further the threat may not be limited to that specific group, which makes specific identifiable information so important.

ECF 62-5, ¶ 7.[6] If an inmate "voices a generalized fear for his safety, but refuses to provide information in support, then the [inmate] can refuse housing," in which case the inmate is issued an infraction and receives time on disciplinary segregation. ECF 62-3, ¶ 6. Martin has, at times, refused housing because he fears he will be harmed by the Bloods, and WCI, in turn, placed him on disciplinary segregation because the prison said it could not verify any threats. *Id.* ¶ 12.[7]

## II.   Standard of Review

The defendants move to dismiss the complaint for failure to state a claim or, alternatively, for summary judgment. Martin received sufficient notice that the motion may be treated as a summary judgment motion. The Court sent Martin a notice to that effect, ECF 43; the defendants' motion identified summary judgment as possible relief; and the Court granted Martin an additional

---

[6] Clise, who is not a named defendant and apparently did not have any knowledge about Martin's fears before Martin was assaulted, states he is now aware Martin identified the Bloods as a threat, "but in voicing concerns related to perceived threats, [Martin] did not identify any specific individual who posed a danger to him," the date of the threat, or any other supporting details. ECF 62-5, ¶ 6.

[7] On April 5, 2023, Martin signed an administrative segregation waiver form and stated he did "not fear placement in general population." ECF 40-4, at 3. However, he insists that he signed it because he was "coerced and forced to sign[] the waiver form presented by defendant, Jefcoates [sic]," who told him signing was "the only way he would be allowed to work and get his education [GED]," ECF 46, at 7–8. Martin says that within an hour of his return to general population on April 16, 2023, he "was aggressively approached by the leader of the Bloods, [D.A.] and another Blood named [A.J.] in front of his cell . . . and was warned that if he did not leave the general population immediately that they were going to kill him." *Id.* at 8. In response to that threat, Martin refused housing in general population. *Id.* at 8–9. After this incident, Martin was transferred to NBCI.

opportunity to supplement his response with evidence, ECF 54, which he did, ECF 55. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). Thus, the Court will resolve the motion under Rule 56.

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 251. The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

### III.    Discussion

Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *Wahi v. Charleston Area Med. Ctr.*, 562 F.3d 599, 615 (4th Cir. 2009).

A defendant's own action—or failure to act—is required for liability under § 1983. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). There is no *respondeat superior* liability under § 1983. *Love-Lane*, 355 F.3d at 782. Officials may be found liable only if the plaintiff shows the official "acted personally in the deprivation of the plaintiff['s] rights." *Vinnedge*, 550 F.2d at 928 (quoting *Bennett v. Gravelle*, 323 F. Supp. 203, 214 (D. Md.), *aff'd*, 451 F.2d 1011 (4th Cir. 1971)).

To establish supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must show that (1) the supervisor had actual or constructive knowledge that a subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff"; (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson ex rel. Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

### A.  Failure to Protect

Martin alleges Warden Weber, Jefcoat, Smith, Harbaugh, and Beeman violated his Eighth Amendment rights by failing to protect him from the March 13, 2022 assault. "The Eighth Amendment protects prisoners from 'unnecessary and wanton infliction of pain.'" *Thompson v. Commonwealth of Virginia*, 878 F.3d 89, 97 (4th Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). Under the Eighth Amendment, prison officials must "take reasonable measures to guarantee the safety of . . . inmates." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319–20 (1986)). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

To prevail on a failure-to-protect claim, the plaintiff must show first, that the deprivation of protection from harm was an "extreme deprivation" that "was *objectively* 'sufficiently serious,'" and second, that "*subjectively* 'the officials act[ed] with a sufficiently culpable state of mind.'" *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (quoting *Strickler v. Waters*, 989 F.2d 1375, 1379 (4th Cir. 1993) (first emphasis in *De'Lonta*; second emphasis in *Strickler*)); *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014). The plaintiff can establish the objective element by showing either "'a serious or significant physical or emotional injury resulting from the challenged conditions'" or "a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions." *De'Lonta*, 330 F.3d at 634 (quoting *Strickler*, 989 F.2d at 1381, and citing *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). The objective inquiry requires the court to "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling*, 509 U.S. at 36.

As for the subjective element, the prisoner must show that the defendant has "knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). The "sufficiently culpable state of mind" required for the subjective element "is one of deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks and citations omitted). "[D]eliberate indifference is 'a very high standard,'" for which "[a] 'showing of mere negligence' will not suffice." *Danser*, 772 F.3d at 347 (quoting *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999)). The Supreme Court has delineated the difference between tort liability and liability for a constitutional violation:

> The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. *See Prosser and Keeton* §§ 2, 34, pp. 6, 213–214; *see also* Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680; *United States v. Muniz*, 374 U.S. 150 (1963). But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837–38.

### 1.  Warden Weber, Smith, and Beeman

Martin has not identified any evidence that Warden Weber, Smith, or Beeman knew about a threat to his safety before the March 2022 assault. In the years before the assault, Martin wrote repeatedly to the NBCI warden about fears for his safety, but there is no evidence Martin ever communicated those or similar fears to Warden Weber or that Weber knew about Martin's April 30, 2021 inmate statement or any ensuing investigation. The same goes for Beeman and Smith. Beeman declared that the "only information" he had about Martin came from a January 2022 email informing him that Martin had been "placed on AS in May 2021 due to an enemy situation" and that Martin had "signed off on one enemy and the other was transferred." ECF 62-6, ¶¶ 5, 6; *see*

ECF 40-7, at 1. That email did not put Beeman on notice of the risk of harm that Martin faced if he was returned to general population. As for Smith, Martin has not identified any evidence suggesting Smith knew about the risk of harm to Martin.

Without any evidence that Warden Weber, Beeman, or Smith knew that Martin's safety was at risk, Martin cannot establish their personal participation in a violation of his constitutional rights or supervisory liability against Warden Weber. Summary judgment on the failure-to-protect claim is granted in favor of these defendants.[8]

### 2. Jefcoat and Harbaugh

Unlike with Warden Weber, Beeman, and Smith, there is evidence that Jefcoat and Harbaugh knew, before the assault, that Martin feared the Bloods would hurt him because Martin was labeled a snitch. Whether they responded reasonably to that risk of harm is the central question here.

Start with Jefcoat. On about April 25, 2021, Martin informed Jefcoat that he feared the Bloods would hurt him because he was labeled a snitch. In response to this expression of fear, Jefcoat directed Martin to write an inmate statement documenting his fears. Martin, then, wrote that he feared the Bloods would hurt or kill him for being a snitch. He explained the basis for his fear: He was a Bloods member who had been labeled a snitch because his co-defendant (also incarcerated at WCI and also a Bloods member) had shared with other WCI inmates the transcript

---

[8] If Martin had brought this claim against Sindy or Davis, which he may have intended to do, *see* ECF 46, at 10–11 (referring to both as defendants with liability for failure to protect), it would have failed for the same reason: There is no evidence in the record currently before the Court that either of them knew that Martin feared the Bloods would hurt him. The only evidence of Sindy's and Davis's knowledge is the January 2022 email chain in which Davis asked about returning Martin to general population because the concerns about the two specific enemies known to Davis had been eliminated and Sindy replied "Ok with me- No metal involved." Their emails do not show that they knew Martin's fear extended beyond two specific individuals, neither of whom was his assailant.

of Martin's trial testimony against him and a letter Martin wrote to the judge. Jefcoat witnessed the statement. There is no evidence that Jefcoat had a responsibility to investigate the statement or do anything more after he witnessed the statement. And when the decision to return Martin to general population was made seven months later, Jefcoat was not involved because he no longer was Martin's case manager. Thus, the undisputed evidence shows that Jefcoat's conduct was appropriate in light of the risk of harm that Martin identified. Martin, therefore, cannot establish that Jefcoat was deliberately indifferent to his safety. *See Farmer*, 511 U.S. at 834; *Timpson*, 31 F.4th at 257; *Shaw*, 13 F.3d at 799. Summary judgment is granted in favor of Jefcoat on Martin's failure-to-protect claim.

Now consider the evidence against Harbaugh. He admits he received Martin's inmate statement. ECF 62-3, ¶¶ 7, 10. Therefore, Harbaugh knew the fears that Martin expressed in the statement and the nature of the harm Martin faced and why.

What did Harbaugh do in response to this known risk? The evidence is equivocal. Harbaugh says he assigned an investigator from the Intelligence Division to investigate the claims in Martin's inmate statement, even though Harbaugh believed the "statement, in and of itself, was not sufficient to investigate a specific threat." ECF 62-3, ¶ 10. Harbaugh does not identify the assigned investigators by name. To Harbaugh's knowledge, "Martin never provided any additional information to investigators regarding the threat itself, any involved individuals, dates, times, or locations to assist in the investigation." *Id.* Harbaugh does not specify what allegations were investigated or what the investigation entailed. Typically, during investigations, Harbaugh says investigators in the Intelligence Division "reach out to confidential sources and other individuals throughout the institution" and review documents, including anonymous statements, to determine whether the threat can be verified. *Id.* ¶ 8. But did those things happen in Martin's case? Did they

investigate whether the transcript of Martin's trial testimony and a letter Martin wrote to the judge had been circulated among other inmates, as Martin alleged in his statement? Harbaugh does not say. Did they investigate the possibility of an attack by the Bloods because Martin was deemed a snitch? Again, Harbaugh does not say. Harbaugh asserts that at the conclusion of the investigation, "it was determined that Plaintiff's allegations were unsubstantiated." *Id*. Again, who made that determination and based on what? Following the investigation into Martin's claims, Harbaugh claims the "allegations could not be verified and it was determined that he could be returned to the general population." *Id*. ¶ 12.[9]

Martin swears "no investigation was initiated." ECF 55, ¶ 3. This cannot be easily dismissed as a self-serving statement, because if prison policy had been followed, Martin would have been consulted regularly during the investigation and one would expect to see documentation of the consultations. *See* ECF 62-5, ¶ 4 (noting case management had weekly meetings with inmates on administrative segregation). There is none. One also would expect to see documentation of the pre-assault investigation into Martin's statement, but Harbaugh has produced none. Yet Harbaugh did produce documents showing *other* investigations occurred. According to those documents, Harbaugh asked Beeman on March 21, 2022—eight days after the assault on Martin—to report on Martin by April 5. ECF 62-4, at 6. On March 28, someone (whose signature is unintelligible) reported that Martin was "good with" placement in administrative segregation. *Id.* at 7. Then, on November 21, 2022, Harbaugh asked Beeman to investigate the concerns in Martin's November 18, 2022 inmate request form by December 6. *Id.* at 2. In response, someone

---

[9] The Court cannot answer these questions based on the evidence. One reasonable interpretation of the evidence, however, is that the prison did not investigate the basis for Martin's fear of the Bloods at all, and instead, "concluded that Martin's co-defendant was the source of the perceived threat, and that transferring the codefendant to another institution would eliminate any threat to Plaintiff." ECF 52, at 2.

(whose signature is unintelligible) reported that Martin was housed on administrative segregation, was on the "Max transfer List," was "always complaining," and was "[n]ot a candidate for [protective custody]." *Id.* at 3. The absence of any similar documents showing an investigation into Martin's April 30, 2021 inmate statement suggests there was no investigation.

Could there be no documentary evidence of an investigation because there was no investigation? The sworn statements of Harbaugh and Clise can be read to support that inference. Harbaugh says "enemy designations are specific to individuals rather than groups" and that Martin never provided any information to investigators about "individuals, dates, times, or locations to assist the investigation." ECF 62-3, ¶¶ 9, 10. Echoing Harbaugh, Clise, a Correctional Case Management Specialist Two and Assistant Litigation Coordinator within DPSCS, states that "DOC policy towards Enemy Alerts pertains to individuals, not entire groups. In addition to the identification of a specific individual, there must be documentation to support the designation of the individual as an enemy." ECF 62-5, ¶ 6. Clise takes the position that case management "needs to have a specific name to verify and document an enemy so these individuals can be kept apart," because it "is not feasible to keep an individual away from an entire group because doing so would not confirm a threat was resolved" and the institution "may not know all members of that specific group." *Id*. ¶ 7. As to Martin, Clise says, "I am aware that [Martin] identified that he feared the Bloods, but in voicing concerns related to perceived threats, he did not identify any specific individual who poses a danger to him." *Id*. ¶ 6. These statements, when considered in the light most favorable to Martin, suggest no investigation into Martin's allegations occurred because the prison did not believe they were specific enough to investigate.

Thus, there is a genuine dispute of material fact as to whether an investigation into the allegations in Martin's inmate statement occurred, as Harbaugh says it did, and what the

investigation entailed. The Court, therefore, cannot conclude as a matter of law that Harbaugh acted appropriately in response to the risk of harm Martin described in his inmate statement.

If Harbaugh and WCI prison staff are suggesting that threats of harm for being a "snitch" are not specific enough to warrant investigation or protection unless the inmate identifies a specific, individual "enemy" rather than an entire gang, they are mistaken. This position has been flatly rejected by other courts. *See Moore v. Mann*, 823 F. App'x 92, 96 (3d Cir. 2020) (noting "other circuits have held that prison officials' failure to protect an inmate labeled a 'snitch' constitutes deliberate indifference" and finding a genuine dispute about deliberate indifference to the inmates' safety when prison officers used "snitch" and other labels for them in front of other inmates); *Hartsell v. Dietz*, No. 3:20-CV-588-MGG, 2023 WL 6382578, at *6 (N.D. Ind. Sept. 30, 2023) (denying summary judgment on a failure-to-protect claim because the prison staff "had a clear duty to protect" the plaintiff after he "communicated [to them] his fear of retaliation for snitching on a gang member"); *see also Green v. Campbell*, No. GJH-20-2527, 2021 WL 5114364, at *1 (D. Md. Nov. 3, 2021) (denying summary judgment where, as here, an inmate provided a specific reason he feared a gang attack—because he owed money to the gang—and there was "no indication on th[e] record that an investigation into Green's assertion that he owed money to the DMI and that his safety was still in peril took place prior to requiring Green to return to general population").

A "reputation as a snitch places [an] inmate 'at a substantial risk of injury at [other inmates'] hands." *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001) (quoting *Reece v. Groose*, 60 F.3d 487, 488 (8th Cir. 1995)); *see also Northington v. Marin*, 102 F.3d 1564, 1567 (10th Cir. 1996) (affirming judgment for the plaintiff because the evidence showed the defendant was deliberately indifferent under the *Farmer* standard when "he spread a rumor in the jail that an

inmate was a snitch," knowing "the inmate would probably be beaten by other inmates"). Of course, "'[g]eneral fears about being harmed by a fellow inmate or a prison gang are not enough' to establish an Eighth Amendment violation." *Wolf v. Tewalt*, No. 1:21-CV-00226-DCN, 2021 WL 5132423, at *8 (D. Idaho Nov. 3, 2021) (citation omitted). Thus, courts have held that, "to satisfy *Farmer*, the prisoner must present evidence of a particularized fear based upon prior threats or upon members of a specific group who have the motive and the ability to commit an assault themselves or through intermediaries." *Id.* But, the Supreme Court has held that "prison authorities may not . . . ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year" because "[i]t would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them." *Helling v. McKinney*, 509 U.S. 25, 33 (1993).

Martin's expression of fear was sufficiently particularized. Contrary to the defendants' assertion that Martin's "co-defendant was the source of the perceived threat," ECF 52, at 2, Martin never said he feared his co-defendant. Martin said he feared the Bloods because he had been "labeled a snitch and a rat." ECF 40-5. He said he was a former Bloods member who testified against his co-defendant (another Bloods member), and his co-defendant had been showing other inmates a letter that Martin wrote to the judge and the transcript of Martin's trial testimony in which Martin said his co-defendant was the shooter. *Id.* He said inmates had been talking about his testimony since he arrived at WCI. *Id*. This fear was specific enough to warrant an investigation. Even though Harbaugh thinks that the label "snitch" does not necessarily jeopardize all inmates housed in the general population, because many inmates at WCI "have been labeled a snitch during their incarceration, but went on to live in the General Population without incident," ECF 62-3, ¶ 11, that does not mean Harbaugh appropriately responded to the risk of harm

identified in Martin's inmate statement. A factfinder could find the risk of serious harm to Martin obvious. *Reece*, 60 F.3d at 491 (affirming denial of summary judgment based on qualified immunity when the inmate was labeled "a 'snitch,' and had testified for the prosecution in a murder trial" and those "facts [were] known to the prison population as well as prison officials").

This case is easily distinguished from other cases where this court granted summary judgment in favor of the defendants on failure-to-protect claims brought by inmates who alleged they were targeted by gangs but did not provide a basis for their fear. In *Stewart v. Warden*, the plaintiff, who had been assaulted by another inmate, alleged he had informed his case manager before the attack that "there [was] a 'hit' on his life by prison gangs" and specifically the Black Guerilla Family ("BGF")." No. JFM-10-2926, 2013 WL 1010471, at *1, *2 (D. Md. Mar. 13, 2013). The defendants provided evidence that an officer communicated daily with reliable gang member informants who "[f]requently . . . advised" him "of the gang's intention to harm an inmate, allowing [the officer] to arrange for enhanced security for the targeted inmate." *Id.* at *3. The officer stated that "the plaintiff's name ha[d] never been mentioned by an informant as a target for a hit." *Id.* Harbaugh does not similarly describe the nature of the investigation into Martin's claims. Stewart, like Martin, "was unable to identify the name of any person he considered a threat," but unlike Martin, Stewart "could provide no reason he would be targeted by any gang," and, "[b]ased on his experience, [the officer] believe[d] plaintiff's claim of a gang hit ha[d] been made in an effort to manipulate housing." *Id.* And, unlike here, the defendants there confirmed that the assailants were not verified gang members. The defendants, therefore, were not deliberately indifferent to Stewart's safety because they showed they investigated his claims and found them to be "baseless." *Id.* at *7; *see also Stewart v. Maryland Division of Correction*, No. JFM-15-1287, 2017 WL 665986 (D. Md. Feb. 16, 2017) (granting summary judgment on another failure-to-

protect claim when Stewart, a prolific filer, again did not explain why the gang was threatening him and the record did not support "Stewart's assertions that defendants were aware of a substantial risk to his safety"), *aff'd*, 849 F. App'x 68 (4th Cir. 2021); *Henson v. Soltas*, No. RDB-14-3676, 2016 WL 205373, at *2, *10 (D. Md. Jan. 15, 2016) (granting summary judgment where defendants housed plaintiff with gang members who then assaulted him because "[t]here [was] simply no indication that Defendants had advanced word from Plaintiff or anyone else that Plaintiff was in particular danger of assault by [his assailants], or any other inmate" and his assailants were not verified gang members); *Gabriel v. DeVore*, No. JKB-16-471, 2017 WL 371801, at *2, *8–9 (D. Md. Jan. 26, 2017) (granting summary judgment to prison officials because "[t]he risk articulated by plaintiff was that there was a general vendetta against him that emanated from a security threat group, but he never provided any basis for that allegation to prison officials or in this court," he did not "provide the identity of any individual person who had threatened him," and "[a]ll efforts to investigate plaintiff's allegations failed to reveal any basis in fact for his fears").

Based on this record, the Court cannot conclude that Harbaugh was not deliberately indifferent to Martin's safety. *See Timpson*, 31 F.4th at 257; *Shaw*, 13 F.3d at 799. There is evidence that Harbaugh received and reviewed Martin's inmate statement in which Martin expressed his fear that he would be hurt or killed by the Bloods because he was a snitch. Whether Harbaugh's response to this particularized risk was appropriate is genuinely disputed. The motion for summary judgment on Martin's failure-to-protect claim against Harbaugh is denied.

### B.    Access to the Courts

Martin appears to allege that Sindy, Yates, and McKenzie denied his requests for his prison base file and other documents. The Court interprets this as an access-to-courts claim.

Prisoners have a constitutionally protected right of access to the courts, pursuant to which they must be afforded a "reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement." *See Lewis v. Casey*, 518 U.S. 343, 350, 356 (1996) (citing *Bounds v. Smith*, 430 U.S. 817, 821 (1977), and narrowing the holding in *Bounds*). This right "guarantees . . . the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Id*. at 355–56. To state a claim for denial of access to courts, a plaintiff must allege "'actual injury' to 'the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.'" *O'Dell v. Netherland*, 112 F.3d 773, 776 (4th Cir. 1997) (quoting *Lewis*, 518 U.S. at 355). That is, the plaintiff must allege that the defendants "frustrated or . . . impeded" a "nonfrivolous legal claim." *Lewis*, 518 U.S. at 353. And, the plaintiff "must . . . identify an actual injury resulting from [that] official conduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Strickler v. Waters*, 989 F.2d 1375, 1382–85 (4th Cir. 1993)); *see also Pronin v. Johnson*, 628 F. App'x 160, 161 (4th Cir. 2015) (noting "a prisoner must demonstrate that he suffered an actual injury, such as missing a court-imposed deadline or being unable to file a complaint because of the Defendants' actions" (citing *Lewis*, 518 U.S. at 351–52)).

The right of access "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). "It follows that the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Id.* The plaintiff must sufficiently describe the underlying claim to allow the court to assess whether the claim was "nonfrivolous" or "arguable." *Id*.

In an administrative grievance that Martin submitted as an exhibit, he claimed that he needed his base file for "an upcoming judicial purpose/court hearing." ECF 21-1. However, he does not specify the nature of the "judicial purpose" or the "court hearing" or how not having the base file prevented or impeded his ability to challenge his sentence or conditions of confinement. *See id.* No matter, because the defendants have submitted evidence that Martin received a copy of his base file on November 13, 2022. ECF 40-3, at 3. Martin does not dispute this evidence. And he does not offer any evidence that he suffered harm, such as not meeting a deadline, because the defendants did not produce the file before then. Thus, the defendants are entitled to summary judgment on this claim.

## C. Qualified Immunity

The defendants assert they are qualifiedly immune from the failure-to-protect claim, a defense the Court will consider as to the one remaining defendant, Harbaugh. Qualified immunity is an affirmative defense to § 1983 claims that "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "To determine whether a defendant is entitled to qualified immunity," courts ask two questions: "(1) Has the plaintiff alleged a violation of a federal right? (2) Was the right at issue clearly established at the time of the alleged violation?" *Burns-Fisher v. Romero-Lehrer*, 57 F.4th 421, 424 (4th Cir. 2023) (quoting *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019)). The plaintiff bears the burden of proving that a constitutional violation occurred, and the defendant bears the burden of proving that the constitutional right allegedly violated was not clearly established. *See Meyers v. Baltimore Cnty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013); *Henry v. Purnell*, 501 F.3d 374, 377–78 (4th Cir.

2007). The Court may address either question first, and a "defendant official is entitled to qualified immunity if either prong is not satisfied." *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018) (quoting *Pearson*, 555 U.S. at 236).

A right is "clearly established" if "it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015). The Court must "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams v. Ferguson*, 884 F.3d 219, 227 (4th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)). To determine whether a right was clearly established, the Court considers whether "existing precedent . . . placed the statutory or constitutional question beyond debate," making it "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Martin claims Harbaugh failed to protect him from assault by the Bloods even though Harbaugh knew that Martin feared the Bloods would hurt him because he testified publicly against his co-defendant, a Bloods member. This is an alleged violation of Martin's Eight Amendment right to protection from violent assault by other inmates. Harbaugh does not argue the right was not clearly established at the time of the alleged violation. ECF 40-1, at 12.

Instead, Harbaugh simply asserts that "it is clear that the actions of all Defendants were objectively reasonable with regard to protecting Plaintiff from threats of harm." ECF 40-1, at 12. It is not so clear to the Court. There is evidence that Harbaugh knew that Martin faced an excessive risk of harm but did not respond to that risk appropriately. When the record is construed in the light most favorable to Martin, a reasonable jury could find that Harbaugh was deliberately

indifferent to an excessive risk of harm to him. Therefore, the Court concludes that, on the record

before it, Harbaugh is not entitled to qualified immunity as a matter of law.

## IV.    Motion for Injunction

Martin asks the Court to order the defendants to house him in administrative segregation

at NBCI or transfer him to another prison where he can be housed in protective custody, either for

the remainder of his incarceration or until this case is resolved. ECF 53, at 4. A party seeking

injunctive relief must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of

suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips

in the party's favor; and (4) why the injunction is in the public interest. *See Winter v. Nat. Res.

Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "To establish irreparable harm, the movant must make

a 'clear showing' that [he] will suffer harm that is 'neither remote nor speculative, but actual and

imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes

Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*,

952 F.2d 802, 812 (4th Cir. 1991)). A preliminary injunction is "an extraordinary remedy" and

therefore injunctive relief "may only be awarded upon a clear showing that the plaintiff is entitled

to such relief." *Winter*, 555 U.S. at 22.

The Court cannot order the defendants to transfer Martin to another prison. A decision to

transfer is within the purview of the State of Maryland and the DPSCS. *Williams v. Maryland*, No.

DKC-09-879, 2011 WL 3422825, at *8 (D. Md. Aug. 3, 2011). Neither the State nor DPSCS is a

defendant in this action, and therefore they cannot be subject to a permanent injunction issued in

this case. *See id.* (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 112 (1969)).

And, relief unavailable in a permanent injunction cannot be provided through a preliminary

injunction. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).

Nor can the Court order officials at NBCI to place Martin in administrative segregation or protective custody because NBCI officials are not defendants in this case and Martin has not alleged NBCI officials were deliberately indifferent to a known risk of harm. Accordingly, his motion for an injunction is denied.

## V.      Conclusion

The defendants' motion, ECF 40, treated as a motion for summary judgment, is denied as to the failure-to-protect claim against Harbaugh; granted as to the failure-to-protect claim against Weber, Jefcoat, Smith, and Beeman; and granted as to the access-to-courts claim. Summary judgment is entered in favor of Weber, Jefcoat, Smith, Beeman, McKenzie, Sindy, and Yates. Martin's motions for appointment of counsel, ECF 59 and 64, are granted, and his motion for injunctive relief, ECF 53, is denied.

A separate Order follows.

March 28, 2024
_____
Date

_____
Deborah L. Boardman
United States District Judge